Todd M. Friedman (SBN 216752)
Adrian R. Bacon (SBN 280332)
Meghan E. George (SBN 274525)
Thomas E. Wheeler (SBN 308789)
LAW OFFICES OF TODD M. FRIEDMAN, P.C.
21031 Ventura Blvd., Suite 340
Woodland Hills, CA 91364
Phone: (323) 306-4234
Fax: 866-633-0228
tfriedman@toddflaw.com
abacon@toddflaw.com
mgeorge@toddflaw.com
twheeler@toddflaw.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TERRY FABRICANT, individually and on behalf of all others similarly situated, | Case No. 2:22-cv-00294 |
| | **CLASS ACTION** |
| Plaintiff, | **COMPLAINT FOR VIOLATIONS OF:** |
| vs. | 1. NEGLIGENT VIOLATIONS OF THE TELEPHONE CONSUMER PROTECTION ACT [47 U.S.C. §227(b)] |
| NEXT LEVEL CAPITAL SOLUTIONS LLC; DOES 1 through 10, inclusive, | 2. WILLFUL VIOLATIONS OF THE TELEPHONE CONSUMER PROTECTION ACT [47 U.S.C. §227(b)] |
| Defendant. | |
| | **DEMAND FOR JURY TRIAL** |

Plaintiff TERRY FABRICANT ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following upon information and belief based upon personal knowledge:

## NATURE OF THE CASE

1. Plaintiff brings this action individually and on behalf of all others similarly situated seeking damages and any other available legal or equitable remedies resulting from the illegal actions of NEXT LEVEL CAPITAL SOLUTIONS LLC ("Defendant"), in negligently, knowingly, and/or willfully contacting Plaintiff on Plaintiff's cellular telephone in violation of the Telephone Consumer Protection Act, *47. U.S.C. § 227 et seq*. ("TCPA") and related regulations thereby invading Plaintiff's privacy.

2. The TCPA was designed to prevent calls like the ones described within this complaint, and to protect the privacy of citizens like Plaintiff. "Voluminous consumer complaints about abuses of telephone technology – for example, computerized calls dispatched to private homes – prompted Congress to pass the TCPA." *Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 744 (2012).

3. In enacting the TCPA, Congress intended to give consumers a choice as to how creditors and telemarketers may call them, and made specific findings that "[t]echnologies that might allow consumers to avoid receiving such calls are not universally available, are costly, are unlikely to be enforced, or place an inordinate burden on the consumer. TCPA, Pub.L. No. 102–243, § 11. Toward this end, Congress found that

> "[b]anning such automated or prerecorded telephone calls to the home, except when the receiving party consents to receiving the call or when such calls are necessary in an emergency situation affecting the health and safety of the consumer, is the only effective means of protecting

        telephone consumers from this nuisance and privacy invasion."
*Id.* at § 12; see also *Martin v. Leading Edge Recovery Solutions, LLC*, 2012 WL 3292838, at* 4 (N.D.Ill. Aug. 10, 2012) (citing Congressional findings on TCPA's purpose).

4. Congress also specifically found that "the evidence presented to the Congress indicates that automated or prerecorded calls are a nuisance and an invasion of privacy, regardless of the type of call…." *Id.* at §§ 12-13. *See also*, *Mims*, 132 S. Ct. at 744.

5. In a recent decision, the Supreme Court interpreted the term "automatic telephone dialing system" and held that "[t]o qualify as an 'automatic telephone dialing system,' a device must have the capacity either to store a telephone number using a random or sequential generator *or* to produce a telephone number using a random or sequential number generator." *Facebook, Inc. v. Duguid*, 141 S.Ct. 1163 (2021) (emphasis added).

6. In *Duguid*, the Supreme Court provided an example of such systems, stating: "For instance, an autodialer might use a random number generator to determine the order in which to pick phone numbers from a preproduced list. It would then store those numbers to be dialed at a later time." *Id.* at 1171-72 fn. 7.

7. The Sixth Circuit has recognized a distinction between automated calls placed by a dialing system and fielded by a live agent, and agentless prerecorded voice calls: "Congress drew an explicit distinction between 'automated telephone calls that deliver an artificial or prerecorded voice message' on the one hand and 'calls place by 'live' persons' on the other." *Ashland Hosp. Corp. v. Serv. Employees Int'l Union, Dist. 1199 WV/KY/OH*, 708 F.3d 737,743 (6th Cir. 2013).

8. Similarly, the FTC has observed that "prerecorded calls are by their very nature one-sided conversations, and if there is no opportunity for consumers to ask questions, offers may not be sufficiently clear for consumers to make

informed choices before pressing a button or saying yes to make a purchase." 73 FR 51164-01, 51167 (Aug. 29, 2008).

9. In the present case, Defendant and its agent utilized an ATDS to initiate calls to Plaintiff. Plaintiff never provided express consent to Defendant prior to Defendant placing the calls to Plaintiff. As such, Defendant's use of an ATDS gives rise to a claim for violation of the TCPA.

## JURISDICTION & VENUE

10. Jurisdiction is proper under 28 U.S.C. § 1331 because Plaintiff alleges claims under the TCPA, 47. U.S.C § 227 et seq., a federal law.

11. Venue is proper in the United States District Court for the Central District of California pursuant to *28 U.S.C. § 1391(b)(2)* because Defendant does business within the State of California and Plaintiff resides within the County of Los Angeles. Further, Defendant targeted this County by calling Plaintiff.

## PARTIES

12. Plaintiff, TERRY FABRICANT ("Plaintiff"), is a natural person residing in Winnetka, California and is a "person" as defined by *47 U.S.C. § 153 (39)*.

13. Defendant, NEXT LEVEL CAPITAL SOLUTIONS LLC ("Defendant") is a company that provides loans for other businesses and is a "person" as defined by *47 U.S.C. § 153 (39)*.

14. The above-named Defendant, and its subsidiaries and agents, are collectively referred to as "Defendants." The true names and capacities of the Defendants sued herein as DOE DEFENDANTS 1 through 10, inclusive, are currently unknown to Plaintiff, who therefore sues such Defendants by fictitious names. Each of the Defendants designated herein as a DOE is legally responsible for the unlawful acts alleged herein. Plaintiff will seek leave of Court to amend the Complaint to reflect the true names and capacities of the DOE Defendants when such identities become known.

15. Plaintiff is informed and believes that at all relevant times, each and every Defendant was acting as an agent and/or employee of each of the other Defendants and was acting within the course and scope of said agency and/or employment with the full knowledge and consent of each of the other Defendants. Plaintiff is informed and believes that each of the acts and/or omissions complained of herein was made known to, and ratified by, each of the other Defendants.

## COMMON FACTUAL ALLEGATIONS

**A. Defendant Utilizes an ATDS to Place its Marketing Calls**

16. Plaintiff was called by a predictive dialer, which was characteristically identified by no live agent being on the line when it was picked up, a pause, a click, and then being transferred to a live agent. Defendant called Plaintiff using a system that dials campaigns of numbers without human intervention.

17. Upon information and belief, Defendant uses a predictive dialer to place calls *en masse* to the members of the prospective class

18. On information and belief, Plaintiff alleges that Defendant uses a predictive dialing platform for outbound campaigns. Predictive dialing platforms always have automated and predictive dialing capacity. Plaintiff alleges on information and belief that the platform used by Defendant integrates programming code substantially similar to the code described herein below. Upon information and belief, the platform used by Defendant has the capacity to allow an operator to 1) import CSV files containing phone numbers of consumers, 2) utilize number generators to assign these telephone numbers to a dialing campaign, and otherwise store the telephone numbers, and 3) schedule outbound dialing campaigns at a later time to happen automatically using number generation and other algorithmic dialing tools.

19. The capacity of the Defendant's dialing platform to use random or sequential number generators to store or produce telephone numbers will be confirmed or refuted based on the code. Plaintiff alleges that such code exists in

the dialing platform used by Defendant.

### i. The Predictive Dialer

20. The following is the FCC's description of a predictive dialer:

"A predictive dialer is an automated dialing system that uses a complex set of algorithms to automatically dial consumers' telephone numbers in a manner that "predicts" the time when a consumer will answer the phone and a telemarketer will be available to take the call. Such software programs are set up in order to minimize the amount of downtime for a telemarketer. In some instances, a consumer answers the phone only to hear "dead air" because no telemarketer is free to take the call…A predictive dialer is equipment that dials numbers and, when certain computer software is attached, also assists telemarketers in predicting when a sales agent will be available to take calls. The hardware, when paired with certain software, has the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers. Predictive dialers initiate phone calls while telemarketers are talking to other consumers and frequently disconnect those calls when a telemarketer is unavailable to take the next call…Predictive dialers reduce the amount of down time for sales agents, as consumers are more likely to be on the line when the telemarketer completes a call."

*In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Report and Order, 18 FCC Rcd. 14014, 14115 ¶¶ 8 fn 31, 131, and 146 (2003) ("2003 FCC Order").

21. The following is description, in plain English, of a predictive dialer typically operates: A dialer operator accesses a database of consumer contact information, which is typically contained in a text delimited file, either in a CSV file, text file, Microsoft Excel, or Microsoft Access file. In essence, this is a spreadsheet, containing rows and columns of data, which includes telephone numbers. The operator will load this data set into the dialing platform. The dialing system will cut the data set into individual lines, unique to each telephone number with an assigned row using a parser. Parsers will separate the data, and then index

the telephone numbers using either random or sequential number generators, but most commonly sequential number generators. The program will then store the telephone number using that number generator. The data is stored in temporary cache or RAM memory, to be accessed by the dialer platform thereafter. A random or sequential number generator is programmed to select and produce, automatically, without any organic triggering event by a human being, the telephone numbers, i.e. in accessing them from storage. Once the number generator corresponds to a matching number in the stored list, that telephone number will be "produced" from storage to the dialer, which then automatically dials that telephone number. Thus, predictive dialers have the capacity to use random or sequential number generators to both store and produce the telephone number to be automatically dialed by the dialing program, without human intervention.

22. To illustrate this using a real-world example that was provided to undersigned counsel by a software engineer who is fluent in Java and has reviewed dialer code, imagine a list of numbers as a lengthy sheet of lined notebook paper. A parser cuts this into strips, and stores it in a paper tray, which is attached to a scanner. Each strip of paper has a row number, and a telephone number. The scanner uses a program to generate numbers, either sequentially or randomly. That generator is hooked to the paper feed, which instructs the scanner to match the generated number, to the corresponding strip of paper in the tray, and then scan that telephone number from the stored list, through the scanner, and out the other side, at which time the scanner is dialing the telephone number on that strip of paper. Now imagine a scanner that accomplishes this with a tray containing thousands of pages of paper in the blink of an eye. Once the tray is empty, the dialing campaign is complete.

23. The program for dialing campaigns can be pre-set like a sprinkler timer to dial the phone numbers at pre-set intervals and pre-set time periods, based

on how many available agents there are expected to receive calls. This is done by way of yet another algorithm that is programmed to "predict" how long an average call with a consumer takes, and dial only a certain volume of phone numbers per time interval, so as to attempt to reach the highest possible volume of consumers, without reaching so many consumers that the "abandonment rate" exceeds regulatory limits set forth by the FCC. In crude terms, imagine a call center with 100 agents, a 10% chance that a call will be answered, and an average call length of one minute. The predictive dialer will "predict" that it should place 1,000 calls per minute, because 100 of those calls will be answered, and so 100 agents will be available to speak with the consumer. Once those agents get off the line, calls will already be automatically happening in the background from the autodialer's random and sequential number generator described above, and agents will be connected with callers who pick up the line. This process is sometimes referred to as algorithmic dialing.

24. Due to natural statistical variation, sometimes calls will last longer than a minute, and there will be no available agent right away. This results in dead air at the beginning of such calls, or abandoned calls. The percentage of such calls that are picked up and result in dead air, is referred to as the "abandonment rate" and is regulated by the FCC, because it is incredibly annoying to pick up the line and be greeted with silence. This was heavily discussed during the congressional hearings as highly problematic in 1991 during the TCPA hearings. In other words, this is not new technology. It is the same technology Congress was trying to regulate when it enacted the TCPA. It is the same technology that has been subject to FCC regulations for decades.

25. Plaintiff alleges on information and belief that Defendant's system has predictive dialing capacity substantively similar to the illustrations described herein, and therefore has the capacity to store and produce telephone numbers to be called using a random or sequential number generator.

### ii. The Radom/Sequential Number Generator

26. Undersigned counsel have studied the code used to program predictive dialers and other similarly-functioning autodialers in the past, with the assistance of software engineers fluent in Java, and have found that such autodialers, when used in automated mode, execute code that relies upon random or sequential number generation to both store and produce numbers to be dialed by the dialer. For instance, a common "parser" used in SMS blasters and predictive dialing coding integrates the following open-source Apache code into an autodialing dialing platform:

```
730     if (!this.recordList.isEmpty()) {
731         this.recordNumber++;
732         final String comment = sb == null ? null : sb.toString();
733         result=newCSVRecord(this,this.recordList.toArray(Constants.EMPTY_STRING_ARRAY), comment,
734             this.recordNumber, startCharPosition);
735     }
736     return result;
737 }
```
[1]

27. These lines of code, and specifically the "++" in line 731, represent an operator token that generates sequential numbers as part of a loop. This loop is used to select which number from the CSV file, will be dialed, and produce that number to the dialer using a CSV parser. Such programs can dial thousands of consumers in mere seconds, without any human intervention whatsoever, based on whatever abandonment rate is targeted by the operator of the dialing platform. The sequential number generator in the code above is executed in the process of mass

---

[1] Available here: https://commons.apache.org/proper/commons-csv/apidocs/src-html/org/apache/commons/csv/CSVParser.html

predictive dialing. The program cannot function, and therefore cannot dial any phone numbers at all, without this sequential number generator.

28. Plaintiff alleges that Defendant used a predictive dialing system with the similar capacity to autodial numbers as shown above. Functionally, that is simply how predictive dialers work. They rely on random or sequential number generators to instruct the data set to produce telephone numbers to the dialer. Without this key component, a dialing campaign would require an agent to manually place the call, through organic decision making, or as was the case in *Duguid v. Facebook*, through some other organic one-to-one triggering event that instructs the dialer to place the call.

29. Plaintiff will not be able to demonstrate whether the code for Defendant's dialing system contains such random or sequential number generators without doing discovery and obtaining the code for the dialing platform. Plaintiff makes these allegations on information and belief based the fact that there was a pause at the beginning of the call Plaintiff received before being transferred to a live agent an indicator that it was autodialed with a predictive dialer.

30. The problem with these known realities is that because Plaintiff does not and could not ever have access to Defendant's proprietary code, which is in its sole possession, Plaintiff cannot allege with any more specificity that the system's code contains such language. However, based on detailed discussions with experts and years of litigation and expertise surrounding such technology, Plaintiff, and his counsel, have a legitimate and sufficient good faith basis to make these allegations, and assert that if the system is a traditional predictive dialer as alleged, *then it will have some variation on the coding that is described herein*, which will undoubtedly include either random or sequential number generators that are being executed in conjunction with storing and dialing the telephone numbers, including the dialing of Plaintiff's phone number.

31. In Defendant's overzealous attempt to market its services, it placed

(and continues to place) phone calls via ATDS to consumers who never provided consent to call and to consumers having no relationship with Defendant.

32.  Defendant knowingly made (and continues to make) these telemarketing calls via ATDS without the prior express written consent of the call recipients. As such, Defendant not only invaded the personal privacy of Plaintiff and members of the putative Class, but also intentionally and repeatedly violated the TCPA.

### FACTS SPECIFIC TO PLAINTIFF TERRY FABRICANT

33.  Plaintiff is the regular carrier and exclusive user of his cellular telephone number which ends in -1083. The number is assigned to a cellular telephone service for which Plaintiff is charged for incoming calls pursuant to 47 U.S.C. § 227(b)(1).

34.  Plaintiff has never had a business relationship with Defendant.

35.  Plaintiff never provided Defendant with prior express consent to contact him on his phone via a telephone call.

36.  Nonetheless, on or around March 20, 2019, Defendant called Plaintiff on his cellular telephone, attempting to get Plaintiff to take out a business loan from Defendant.

37.  Defendant placed the March 20, 2019 phone call from the telephone number confirmed to belong to Defendant, (347) 561 – 3953.

38.  The March 20, 2019 phone call began with a brief pause, then a "clicking" sound, and Plaintiff was then transferred to a live agent.

39.  The sequence of events during the phone call evinced that Defendant used a predictive dialer, which is a form of an "automatic telephone dialing system" as defined by *47 U.S.C. § 227(a)(1)*, to place the call.

40.  Plaintiff suffered a concrete and particularized injury in fact as a result of the unsolicited telemarketing call he received. The call invaded Plaintiff's privacy, causing annoyance, wasting his time, consuming use of his smartphone

device without authorization, and otherwise invading his privacy and intruding into his personal affairs without permission. The telemarketing call also constituted a form of the precise harm that Congress was attempting to prohibit with the TCPA, which was designed to remedy known tortious acts including invasions of privacy and nuisances caused to Americans by automated telemarketing calls placed without consent. Plaintiff actually suffered this precise injury by receiving the unwanted telephone call, and having his privacy so invaded through a disturbance of his solitude, and unwanted intrusion of his technology and personal space. Accordingly, Plaintiff has Article III standing to seek redress for these violations in Federal Court.

41. The call Defendant made to Plaintiff invaded Plaintiff's privacy and violated 47 U.S.C. § 227(b)(1).

42. Plaintiff has reason to believe Defendant has called, and continues to call, thousands of wireless telephone customers to market its products and services without consent required by the TCPA.

43. In order to redress injuries caused by Defendant's violations of the TCPA, Plaintiff, on behalf of himself and a class of similarly situated individuals, brings suit under the TCPA, 47 U.S.C. § 227, *et seq.*, which prohibits certain unsolicited calls to cell phones.

44. On behalf of the Class, Plaintiff seeks an injunction requiring Defendant to cease all wireless telemarketing and spam activities and an award of statutory damages to the class members, together with costs and reasonable attorneys' fees.

## CLASS ALLEGATIONS

45. Plaintiff brings this action individually and on behalf of all others similarly situated, as a member of the proposed classes (hereinafter, "The Class"), defined as follows:

> All persons within the United States who received any solicitation/telemarketing telephone calls made by or on behalf of Defendant to said person's cellular telephone made through the use of any automatic telephone dialing system and/or an artificial or prerecorded voice and such person had not previously consented to receiving such calls within the four years prior to the filing of this Complaint

46. Plaintiff represents, and is a member of, The Class, consisting of all persons within the United States who received any solicitation/telemarketing telephone calls from Defendant to said person's cellular telephone made through the use of any automatic telephone dialing system or an artificial or prerecorded voice and such person had not previously not provided their cellular telephone number to Defendant within the four years prior to the filing of this Complaint.

47. Defendant, its employees and agents are excluded from The Class. Plaintiff does not know the number of members in The Class, but believes the Class's members number in the thousands, if not more. Thus, this matter should be certified as a Class Action to assist in the expeditious litigation of the matter.

48. The Class is so numerous that the individual joinder of all of its members is impractical. While the exact number and identities of The Class members are unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff is informed and believes and thereon alleges that The Class includes thousands of members. Plaintiff alleges that The Class members may be ascertained by the records maintained by Defendant.

49. Plaintiff and members of The Class were harmed by the acts of Defendant in at least the following ways: Defendant illegally contacted Plaintiff and The Class members via their cellular telephones thereby causing Plaintiff and The Class members to incur certain charges or reduced telephone time for which Plaintiff and The Class members had previously paid by having to retrieve or administer messages left by Defendant during those illegal calls, and invading the

privacy of said Plaintiff and The Class members.

50.  Common questions of fact and law exist as to all members of The Class which predominate over any questions affecting only individual members of The Class.  These common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class members, include, but are not limited to, the following:

    a.  Whether, within the four years prior to the filing of this Complaint, Defendant made any telemarketing/solicitation call (other than a call made for emergency purposes or made with the prior express consent of the called party) to a Class member using any automatic telephone dialing system or any artificial or prerecorded voice to any telephone number assigned to a cellular telephone service;

    b.  Whether Plaintiff and The Class members were damaged thereby, and the extent of damages for such violation; and

    c.  Whether Defendant should be enjoined from engaging in such conduct in the future.

51.  As a person that received numerous telemarketing/solicitation calls from Defendant using an automatic telephone dialing system or an artificial or prerecorded voice, without Plaintiff's prior express consent, Plaintiff is asserting claims that are typical of The Class.

52.  Plaintiff will fairly and adequately protect the interests of the members of The Class.  Plaintiff has retained attorneys experienced in the prosecution of class actions.

53.  A class action is superior to other available methods of fair and efficient adjudication of this controversy, since individual litigation of the claims of all Class members is impracticable.  Even if every Class's member could afford individual litigation, the court system could not.  It would be unduly burdensome

to the courts in which individual litigation of numerous issues would proceed. Individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same complex factual issues. By contrast, the conduct of this action as a class action presents fewer management difficulties, conserves the resources of the parties and of the court system, and protects the rights of each Class member.

54. The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of the other Class members not parties to such adjudications or that would substantially impair or impede the ability of such non-party Class members to protect their interests.

55. Defendant has acted or refused to act in respects generally applicable to The Class, thereby making appropriate final and injunctive relief with regard to the members of the Classes as a whole.

## FIRST CAUSE OF ACTION

**Negligent Violations of the Telephone Consumer Protection Act**

**47 U.S.C. §227(b).**

**On Behalf of The Class**

56. Plaintiff repeats and incorporates by reference into this cause of action the allegations set forth above at Paragraphs 1-55.

57. The foregoing acts and omissions of Defendant constitute numerous and multiple negligent violations of the TCPA, including but not limited to each and every one of the above cited provisions of *47 U.S.C. § 227(b)*, and in particular *47 U.S.C. § 227 (b)(1)(A)*.

58. As a result of Defendant's negligent violations of *47 U.S.C. § 227(b)*, Plaintiff and the Class Members are entitled an award of $500.00 in statutory damages, for each and every violation, pursuant to *47 U.S.C. § 227(b)(3)(B)*.

59. Plaintiff and The Class members are also entitled to and seek injunctive relief prohibiting such conduct in the future.

## SECOND CAUSE OF ACTION

**Knowing and/or Willful Violations of the Telephone Consumer Protection Act**

**47 U.S.C. §227(b)**

**On Behalf of The Class**

60. Plaintiff repeats and incorporates by reference into this cause of action the allegations set forth above at Paragraphs 1-59.

61. The foregoing acts and omissions of Defendant constitute numerous and multiple knowing and/or willful violations of the TCPA, including but not limited to each and every one of the above cited provisions of *47 U.S.C. § 227(b)*, and in particular *47 U.S.C. § 227 (b)(1)(A)*.

62. As a result of Defendant's knowing and/or willful violations of *47 U.S.C. § 227(b)*, Plaintiff and The Class members are entitled an award of $1,500.00 in statutory damages, for each and every violation, pursuant to *47 U.S.C. § 227(b)(3)(B)* and *47 U.S.C. § 227(b)(3)(C)*.

63. Plaintiff and the Class members are also entitled to and seek injunctive relief prohibiting such conduct in the future.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests judgment against Defendant for the following:

## FIRST CAUSE OF ACTION

**Negligent Violations of the Telephone Consumer Protection Act**

**47 U.S.C. §227(b)**

- As a result of Defendant's negligent violations of *47 U.S.C. §227(b)(1),* Plaintiff and The Class members are entitled to and request $500 in statutory damages, for each and every violation, pursuant to *47 U.S.C. 227(b)(3)(B)*.

- Any and all other relief that the Court deems just and proper.

## SECOND CAUSE OF ACTION

## Knowing and/or Willful Violations of the Telephone Consumer Protection Act

## 47 U.S.C. §227(b)

- As a result of Defendant's willful and/or knowing violations of *47 U.S.C. §227(b)(1)*, Plaintiff and The Class members are entitled to and request treble damages, as provided by statute, up to $1,500, for each and every violation, pursuant to *47 U.S.C. §227(b)(3)(B)* and *47 U.S.C. §227(b)(3)(C)*.
- Any and all other relief that the Court deems just and proper.

## JURY DEMAND

64. Pursuant to the Seventh Amendment to the Constitution of the United States of America, Plaintiff is entitled to, and demands, a trial by jury.

Respectfully Submitted this 13th day of January, 2022.

LAW OFFICES OF TODD M. FRIEDMAN, P.C.

By: /s/ Todd M. Friedman
Todd M. Friedman
Law Offices of Todd M. Friedman
Attorney for Plaintiff